IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JANIELE VON EVELYN HAMDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:20cv00236 |
| | ) | |
| ELLEN DENNY, | ) | By: Elizabeth K. Dillon |
| ROBERT F. GRAHAM, | ) | United States District Judge |
| MICHAEL BROWN, | ) | |
| and | ) | |
| ERIC BUCEY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

On April 23, 2020, Hamden filed suit against Brown, Bucey, Denny, and Graham alleging: (1) a state claim of malicious prosecution; (2) a 42 U.S.C. § 1983 civil rights claim for malicious prosecution; (3) a 42 U.S.C. § 1983 civil rights claim for deprivation of a liberty interest without due process; (4) conspiracy to violate civil rights; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress. (*Id.* at 17-21.)

Pending before the court is defendant Eric Bucey's motion to dismiss for failure to state a claim (Dkt. No. 25) and defendants Ellen Denny, Robert Graham, and Michael Brown's motion to dismiss for failure to state a claim (Dkt. No. 27). Following briefing and argument, the motions are ripe for resolution. For the reasons stated below, the court will grant in part and deny in part the motions to dismiss.

I. BACKGROUND

Plaintiff Janiele Von Evelyn Hamden was formerly employed by Radford City Public Schools (RCPS) as a professional school counselor for McHarg Elementary. (Compl. 2, Dkt.

No. 1; Am. Compl. 2; Dkt. No. 21.)   Hamden also served as a lead teacher for McHarg's 21st Century Community Learning Center, known as the Bee Club.  (Am. Compl. 2)  The Bee Club is an afterschool enrichment program funded by a federal grant, the 21st century grant, administered through the Virginia Department of Education (VDOE).  (*Id.* at 3.)

Defendant Eric Bucey is the executive director of the non-profit organization, Beans & Rich, Inc. (B&R), which he operates to provide support to public school enrichment programs.  (*Id.*)  RCPS and B&R are co-applicants on the 21st century grant that funds the Bee Club at McHarg Elementary.  (*Id.*)  Defendant Robert F. Graham is listed on the grant as the point of contact for RCPS and Bucey is the point of contact on the grant for B&R.  (*Id.*)

RCPS and B&R entered into a Memorandum of Understanding (MOU) to establish a limited partnership for the purpose of administering the Bee Club.  (*Id.* at 4.)  Under the MOU RCPS is responsible for "providing facility space, handling building maintenance, purchasing equipment, collecting time sheets, collecting and tracking data related to program evaluation, paying all personnel through grant funds, and submitting reports to VDOE in a timely manner."  (*Id.*)  In addition, the Bee Club is primarily staffed by RCPS employees.  (*Id.* at 5.)

During Hamden's employment with RCPS, Ellen Denny was the curriculum director for RCPS, Graham was the RCPS Superintendent, and Michael Brown was the Principal of McHarg Elementary School.  (*Id.* at 4.)

Hamden states that she "was repeatedly scrutinized and opposed by [] Denny for her stances on equitable treatment for disadvantaged students at RCPS."  (*Id.* at 5.)  For example, Hamden felt that the Effective Schoolwide Discipline Committee was "intrinsically unfair to underprivileged children," and she attempted to reform the committee.  (*Id.* at 5-6.)  Hamden renamed the program Effective Schoolwide Choices, and Denny opposed this change.  (*Id.* at 6.)

Hamden also sought to change the title of her position from "guidance counselor" to "professional school counselor," and Denny and Graham required Hamden to develop a petition in order to gain support for this change, though the change was never implemented.  (*Id.*)  In addition, Hamden advocated for supplemental educational services for students who were experiencing trauma, but this advocacy created tension between her and Denny, Brown, and Graham who favored other school programs.  (*Id.* at 6-7.)

Hamden was also involved in raising money for students at the school.  Hamden led a program to provide food baskets to student families in need at Thanksgiving and continued to participate in this program even after her employment with the school ended.  (*Id.* at 7.) Hamden's successful fundraising efforts led her to develop the Kids in Crisis fund at the school. However, when Denny learned of this fund, he directed Brown to cancel the fund.  (*Id.*) According to Hamden, Denny "possessed a malicious animus against Ms. Hamden for her work and advocacy for all students at RCPS."  (*Id.* at 8.)

On or around September 2017, Hamden requested that the McHarg Bee Club staff receive raises.  (*Id.* at 9.)  "The request was motivated by the fact that after school tutors employed through [a different] grant were compensated at approximately $40 an hour, which was well above the hourly rate received by the lead teachers for the 21st Century Community Learning Center."  (*Id.*)  Bucey informed Hamden that VDOE would not approve the raise.  (*Id.*)

During the fall of 2017, the B&R program director and site director sent various emails to the Bee Club staff about time-keeping practices.  (*Id.*)  The McHarg staff sought clarification on certain points, but "follow-up was not helpful and often led to further confusion regarding time-keeping practices."  (*Id.* at 10.)  Therefore, "the Bee Club staff continued to follow and document

the timekeeping practices previously approved, which included billing for planning and clean up time performed off-site, and their time sheets continued to be approved." (*Id.*)  Brown routinely reviewed and signed-off on Hamden's timesheets.  (*Id.*)

On May 1, 2018, the B&R site director informed the Bee Club staff that they would need to switch to a time clock time-keeping system.  (Id.)  "Hamden conferred with Bee Club staff and communicated to B&R supervisors what she believed was the group's decision that the McHarg Bee Club staff would not be switching to the new system."  (Id.)  Hamden indicated that if this new time-keeping system was required, B&R and RCPS would need to find new Bee Club staff.  (*Id.*)

Shortly thereafter, Bucey, Graham, and Denny began an investigation into Hamden's time-keeping.  (*Id.* at 11.)  Brown also participated in the investigation, though he was aware that Hamden had been billing for off-site planning and clean-up time because he regularly approved her timesheet.  (*Id.*)

Bucey, Graham, and Denny, then suspended Hamden from the Bee Club.  (*Id.*)  On May 3, 2020, Hamden and a fellow teacher explained to Graham how all the Bee Club staff had been billing for time.  (*Id.*)  She "explained that other lead teachers were similarly billing off-site for planning and clean-up time as previously approved."  (*Id.*)  Graham stated that the clean-up time would need to be eliminated and Hamden indicated that she would no longer bill for these tasks. (*Id.*)  Hamden discussed resigning from the Bee Club, but Graham asked her to stay.  (*Id.*) However, later that same day, Brown called Hamden to his office, where Denny was waiting, and they suspended Hamden from RCPS for five days.  (*Id.*)

On or about May 10, 2018, Hamden, represented by counsel, met with Brown and Denny to provide evidence of her innocence.  (*Id.* at 12.)  Hamden asked Brown and Denny to review

4

other staff timecards who billed in the same way she did, but they declined to conduct such a review.  (*Id.*)  Hamden further explained that the Bee Club handbook provides that off-site time may be billed if approved by the site coordinator, as it was in her case.  (*Id.*)  Nevertheless, Hamden states that "Graham, Denny, and Brown continued [] Hamden's suspension indefinitely without advising [her] of the reasons for the suspension in writing or of her right to a hearing."  (*Id.* at 12-13.)

Hamden states that the investigation of her created "an intolerable work environment and causing her significant stress and anxiety."  (*Id.* at 13.)  Although Hamden had planned to work for many more years, she ultimately resigned due to this "increasingly hostile work environment."  (*Id.*)  She submitted her letter of resignation on May 14, 2018.  (*Id.*)  Hamden reports that during the internal investigation, "all Defendants obtained information which established that Ms. Hamden's timekeeping was appropriate."  (*Id.* at 14.)

In June 2018, Denny and Graham turned their internal investigation over to the Virginia State Police on the belief that Hamden had committed a crime.  (*Id.*)  Graham, Denny, Bucey, and Brown all participated in the Virginia State Police investigation, and allegedly "provided incomplete and/or biased information during interviews."  (*Id.*)  Denny informed police that defendants had provided Hamden with a suspension hearing, when Hamden reports that she never received a suspension hearing.  (*Id.*)  Graham informed police that Hamden was billing four hours per day when other staff billed two hours per day, but Hamden reports that her billing had been approved.  (*Id.*)  Brown informed police that Hamden admitted she had been billing improperly, when Hamden asserts she was billing properly. (*Id.*)  Finally, Bucey informed police that "Hamden's timesheets did not match those of other employees, without explaining the difference in program hours she worked."  (*Id.*)

Hamden was charged with one count of conspiracy to obtain money by false pretenses, one count of attempt to obtain money by false pretenses, and fifteen counts of obtaining money by false pretenses. (*Id.* at 16-17.) Hamden and her counsel met with the Radford Commonwealth Attorney and "discussed several pieces of evidence that were available to all Defendants, yet omitted from the evidence." (*Id.* at 17.) On June 14, 2019, all charges brought against Hamden in the Circuit Court of the City of Radford were dropped. (*Id.*) On June 18, 2019, an order of *nolle prosequi* was entered. (*Id.*) "The charges against Ms. Hamden were successfully expunged." (*Id.*)

## II.  DISCUSSION

### A.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a dismissal when a plaintiff fails "to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a complaint must contain sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 550. A court will accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A court need not accept "legal conclusions drawn from the facts," nor "unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In adjudicating a motion to dismiss, a court's review is "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159,

165–66 (4th Cir. 2016).  "[A court may] also consider documents that are explicitly incorporated

into the complaint by reference, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007), and those attached to the complaint as exhibits, *see* Fed. R. Civ. P. 10(c)."  *Id.*  It follows

that a court "may consider a document submitted by the movant that was not attached to or

expressly incorporated in a complaint, so long as the document was integral to the complaint and

there is no dispute about the document's authenticity."  *Id.* (citing *Sec'y of State For Defense v.*

*Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Am. Chiropractic Ass'n v. Trigon*

*Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618

(4th Cir. 1999)).  "[A] document is 'integral to the complaint' 'where the complaint relies

heavily upon its terms and effect.'"  *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147,

153 (2d Cir. 2002)); see also *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015) (document with

"no independent legal significance to [plaintiff's] claim" was not integral to complaint).

"Limited quotation from or reference to documents that may constitute relevant evidence in a

case is not enough to incorporate those documents, wholesale, into the complaint."  *Id.* (quoting

*Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

**B.  Malicious Prosecution**

    **1.  State Claim – Count I**

       "Malicious prosecution actions arising from criminal proceedings are not favored in

Virginia and the requirements for maintaining such actions are more stringent than those applied

to other tort cases."  *O'Connor v. Tice*, 281 Va. 1, 704 S.E.2d 572, 575 (2011).  "To prevail on a

malicious prosecution action, a plaintiff must prove by a preponderance of the evidence that the

prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant or

defendants, (3) without probable cause, and (4) terminated in a manner not unfavorable to the

plaintiff." *R.M.B. v. Bedford Cty. Sch. Bd.*, 169 F. Supp. 3d 647, 653 (W.D. Va. 2016) (citing *Lewis v. Kei*, 281 Va. 715, 708 S.E.2d 884, 889 (2011); *O'Connor*, 704 S.E.2d at 575).

"Although there exists no one articulated rule defining when a criminal proceeding was instituted by or with the cooperation of a defendant, *see Bennett v. R&L Carriers Shared Servs.*, LLC, 744 F. Supp. 2d 494, 510 (E.D. Va. 2010), generally the defendant must have 'affirmatively, actively, and voluntarily took steps to instigate or to participate in the arrest of the defendant, [or the] defendant [must have] exercised some level of control over the decision to have the plaintiff arrested.'" *Id.* (citing *Bennett*, 744 F. Supp. 2d 511–12). "Courts consider whether the defendant 'ever urged or . . . suggested to [an official] that he prosecute the plaintiff.'" *Id.* (quoting *Am. Ry. Express Co. v. Stephens*, 148 Va. 1, 138 S.E. 496, 500–01 (1927)).

"Probable cause as it relates to malicious prosecution actions is defined as 'knowledge of such a state of facts and circumstances as excite the belief in a reasonable mind, acting on such facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected.'" *Thomas v. Lamanque*, 986 F. Supp. 336, 338 (W.D. Va. 1997) (quoting *Bain v. Phillips*, 217 Va. 387 (1976) (quoting *Virginia Ry. and Power Co. v. Klaff*, 123 Va. 260, 96 S.E. 244, 246 (1918))).

"In Virginia malice may be inferred from the absence of probable cause." *Caldwell v. Green*, 451 F. Supp. 2d 811, 818 (W.D. Va. 2006) (citing *Oxenham v. Johnson*, 241 Va. at 281, 288–89 (1991)). "However, malice must exist in fact and be proven like any other fact." *Id.* (citing *Freezer v. Miller*, 163 Va. 180, 203 (1934)). "A wrongful intent must be shown and 'neither lack of probable cause nor the mere failure to act as a reasonably prudent man under the

circumstances in instituting the prosecution is the same thing as malice.'" *Id.* (citing *Freezer*, 163 Va. at 204).

Here, Hamden has pled that "defendants initiated an internal investigation that they controlled and shaped to exclude exculpatory information, [and] brought that biased and prejudicial investigation to the" Virginia State Police, thereby cooperating in the prosecution. (Dkt. No. 33 at 13.)  Hamden further alleges that the prosecution was malicious because it was designed to discredit her reputation and it omitted key facts.  (*Id.* at 12–13.)  Defendants primarily argue that the malicious prosecution claim should be dismissed because there was probable cause for the prosecution.  (Dkt. No. 28 at 5; Dkt. No. 26 at 8.)  Defendants cite documents attached to their motions to dismiss which support the argument that there was probable cause for the prosecution.  (Dkt. No. 26-1; Dkt. No. 28-1.)  However, since these documents are not integral to the complaint, nor even cited in the complaint, the court will not consider them with regard to the motions to dismiss.  Hamden claims that all defendants knew that there was no probable cause for the prosecution because Hamden's timesheets had all been approved by her supervisors and were in line with her colleagues.  (*Id.* at 13.)  Finally, the prosecution ended favorably for Hamden because it was dismissed.  (*Id.* at 14.)  For these reasons, Hamden has pled sufficient facts to sustain her state law claim for malicious prosecution.  The court will deny the defendants' motions to dismiss with regard to Count I.

### 2. Federal Claim – Count II

"A claim of malicious prosecution under [42 U.S.C.] § 1983 is a claim 'founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution.'" *Smith v. Munday*, 848 F.3d 248, 252-53 (4th Cir. 2017) (quoting *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000)).  Like other § 1983 claims, such a claim

requires that defendants acted under the color of state law.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citing 42 U.S.C. § 1983).  "[I]f a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, 'that conduct [is] also action under color of state law and will support a suit under § 1983.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 935 (1982)).  Here, defendants rely primarily on the argument that the complaint insufficiently alleges that they were acting under color of state law regarding charges against Hamden.

"If an individual is possessed of state authority and purports to act under that authority, his action is state action."  *Davis v. Raines*, No. 7:17CV00107, 2018 WL 3869997, at *3 (W.D. Va. Aug. 14, 2018) (citing *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)).  "[S]tate employment is generally sufficient to render the defendant a state actor."  *West*, 487 U.S. at 49.  "On the other hand, '[t]he color of law [or state action] requirement excludes from the reach of § 1983 all merely private conduct, no matter how discriminatory or wrongful.'"  *Davis*, 7:17CV00107, 2018 WL 3869997, at *3 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  But when "'private actions' have a 'sufficiently close nexus with the State [they may] [] be fairly treated as that of the State itself'" so as to constitute state action under § 1983."  *Id.*  "The state action nexus may arise where the defendant's public office provided the motivation for his actions or those actions are 'linked to events which arose out of his official status,' rather than arising 'out of purely personal circumstances.'"  *Id.* at *4 (quoting *Rossignol*, 316 F.3d at 524).

"Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances."  *Skinner v. Railway Labor Executives Assoc.*, 489 U.S. 602, 614 (1989).  In

determining whether a private party acted under the color of state law courts often consider: "(1) 'whether the injury caused is aggravated in a unique way by the incidents of governmental authority,' *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 622 (1991) (citing *Shelley v. Kraemer*, 334 U.S. 1 (1948)); (2) the extent and nature of public assistance and public benefits accorded the private entity, *Edmonson*, 500 U.S. at 621 (citing *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478 (1988)); (3) the extent and nature of governmental regulation over the institution, *American Manufacturers Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999); *Haavistola v. Community Fire Co. of Rising Sun, Inc.,* 6 F.3d 211, 215 (4th Cir. 1993); and (4) how the state itself views the entity, i.e., whether the state itself regards the actor as a state actor; *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352–53 (1974); *Haavistola*, 6 F.3d at 216–17." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 343 (4th Cir. 2000).  Clearly, though, the "receipt of public funds does not make [a defendant's] decisions acts of the State." *Key v. Robertson*, 626 F. Supp. 2d 566, 579 (E.D. Va. 2009) (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 840 (1982)) (citing *Blum v. Yaretsky,* 457 U.S. 991, 1010–11 (1982) (determining that the mere fact that "programs undertaken by the State result in substantial funding of the activities of a private entity" does not suffice to show state action for purposes of a Fourteenth Amendment claim); *Mentavlos v. Anderson*, 249 F.3d 301, 319 (4th Cir. 2001); *Goldstein*, 218 F.3d at 347 (4th Cir. 2000); *Haavistola*, 6 F.3d at 215 (4th Cir. 1993) ("[r]eceipt of state funds [alone] is . . . insufficient to transform . . . private actions into state actions") (quoting *Alcena v. Raine,* 692 F. Supp. 261, 267 (S.D.N.Y. 1988))).

Here, the allegations are sufficient that defendants Denny, Graham, and Brown[1] were acting under color of state law when they referred Hamden's case to the state police.  Denny,

---

[1] Hamden does not allege that Brown referred her case to the state police.  Nevertheless, she alleges that he participated in the police investigation.  (Am. Compl. ¶ 53, 55.)

Graham, and Brown act under color of state law by virtue of their roles as RCPS employees. Denny and Graham initiated, and Brown participated in, the investigation of Hamden's timekeeping in the course of their roles as RCPS employees.  Denny and Graham referred Hamden's timekeeping investigation to the state police based on their internal investigation that arose out of their official status as state actors.  Similarly, Brown's participation in the state police investigation arose out of his official role with RCPS.

The question is less clear for defendant Bucey, however.  But at the pleading stage, the court finds sufficient allegations in the complaint to allow the federal malicious prosecution claim to proceed against Bucey.  His status as executive director of B&R does not make him a state actor, and the grant funding from the state received by B&R is insufficient to make Bucey a state actor.  But, a review of all of the allegations regarding the circumstances of this case and the relationship between B&R and RCPS, show an intertwined relationship with the parties having an MOU to administer the Bee Club and staffing of the club by RCPS employees.  The allegations are sufficient at this stage of the case to proceed against Bucey.

As noted in the prior section, Hamden has adequately pled the state law elements of malicious prosecution.  Therefore, the court will deny the motions to dismiss Count II.

## C.  Deprivation of Liberty Interest Without Due Process Claim – Count III

"Employees have a constitutionally protected liberty interest in their 'good name, reputation, honor, or integrity.'"  *Bayandor v. Virginia Polytechnic & State Univ.*, No. 7:18-CV-00026, 2019 WL 1338906, at *6 (W.D. Va. Mar. 25, 2019) (quoting *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).  "In order to state a claim for deprivation of liberty interest, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the

employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Id.* (citing *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007)). "A person is not deprived of 'liberty' simply because they are not rehired in one job but remain free as before to seek another. *Id.* (citing *Roth*, 408 U.S. at 575). "In *Sciolino*, the Fourth Circuit held that a plaintiff must allege more than the 'mere presence' of stigmatizing charges that 'may be available' to prospective employers in order to state a liberty interest claim; instead, a plaintiff must allege that his termination was 'based on false, stigmatizing charges that are likely to be inspected by prospective employers.'" *Id.*

"If the Plaintiffs can sufficiently allege a protected liberty interest under this framework, then they are entitled to a so-called 'name-clearing hearing' to allow them the opportunity to refute the accusations against them and repair their reputations." *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 616–17 (E.D. Va. 2015) (quoting *Harrell v. City of Gastonia*, 392 Fed. Appx. 197, 203 (4th Cir.2010) (per curiam) (citing *Sciolino*, 480 F.3d at 649)). "Ultimately, 'the constitutional harm is not the defamation itself; rather it is the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge.'" *Id.* (quoting *Sciolino*, 480 F.3d at 649).

"Where, [] the plaintiff-employee resigned and was not discharged, the court must determine whether this resignation was voluntary." *Miller v. Hamm*, No. CIV. CCB-10-243, 2011 WL 9185, at *7 (D. Md. Jan. 3, 2011). "If [the employee] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily" and was not deprived of it by the state." *Id.* (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988). "Only if his resignation 'was so involuntary that it amounted to a constructive discharge,' should it 'be considered a deprivation

13

by state action triggering the protections of the due process clause.'" *Id.* "In *Stone*, the Fourth Circuit identified two circumstances in which 'resignations have been found involuntary . . . :(1) where obtained by the employer's misrepresentation or deception, and (2) where forced by the employer's duress or coercion." *Id.* (quoting *Stone*, 855 F.2d at 174).

"Under the 'duress/coercion' theory, a resignation may be found involuntary if on the totality of circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter." *Id.* Courts may consider, for example, whether the employee was given some alternative to resignation and whether the employee understood the nature of the choice he was given. *Id.* "In applying this totality of circumstances test, the assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation—for example, because of concerns about his reputation—is irrelevant." *Id.* (citing *Christie v. United States*, 518 F.2d 584, 587–88 (1975)). "Similarly, the mere fact that the choice is between comparably unpleasant alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Id.*

Here, Hamden fails to plead the third prong of the *Sciolino* test for deprivation of a liberty interest because she was not terminated from her position with RCPS, but instead resigned. Hamden argues that she was constructively discharged because the discriminatory investigation against her made her feel compelled to resign. (Dkt. No. 33.) However, the standard for involuntary termination under duress or coercion is a high one. On May 3rd, RCPS suspended Hamden for five days, and on May 10th RCPS suspended her indefinitely. (Am. Compl. at 11.) During this time Hamden was suspended with pay. (Hr'g Tr. at 17; Dkt. No. 53).

14

Just four days later, Hamden resigned.  (*Id.*)  Given these allegations, Hamden's resignations cannot be considered to constitute duress or coercion, but rather were voluntary.  As such Hamden has not sufficiently pled all the elements needed to prove a deprivation of a liberty interest.[2]  For these reasons, the court will grant defendants' motions to dismiss with regard to Count III.

## D.  Conspiracy Claim – Count IV

"To establish a conspiracy under 42 U.S.C. § 1983, the plaintiff must show that the defendants acted 'jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in . . . deprivation of a constitutional right.'" *Chavez v. McIntyre*, 424 F. Supp. 2d 858, 861 (W.D. Va. 2006) (quoting *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir. 1996)).  "[A] plaintiff must show . . . that the defendants 'reached an understanding to violate [the plaintiff's] rights.'"  *Smalls v. Binner*, No. 4:15-CV-00017, 2015 WL 4727203, at *4 (W.D. Va. Aug. 10, 2015) (quoting *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002) (quoting *Strength v. Hubert*, 854 F.2d 421, 425 (11th Cir. 1988))).  "Even acquiescence can amount to a conspiracy agreement."  *Smith v. Rector & Visitors of Univ. of Virginia*, 115 F. Supp. 2d 680, 688 (W.D. Va. 2000) (citing *Hafner v. Brown,* 983 F.2d 570, 578 (4th Cir. 1992)).

Here, Hamden has alleged that all defendants acted jointly and committed overt acts in furtherance of a conspiracy to violate her civil rights.  (Am. Compl. ¶ 93.)  Hamden alleges that "all Defendants obtained information which established that Ms. Hamden's timekeeping was

---

[2] None of the cases Hamden cites regarding constructive termination apply in the context of a constitutional deprivation of a liberty interest.  (Dkt. No. 33 at 22 (see *McKinley v. Salvation Army*, 685 F. App'x 227 (4th Cir. 2017) (addressing constructive termination in the context of a Title VII civil rights claim); *Green v. Brennan*, 136 S. Ct. 1769 (2016) (addressing constructive termination in the context of a Title VII civil rights claim); *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (2017) (again addressing constructive termination in the context of a Title VII claim)).)

appropriate," but nevertheless, Denny and Graham referred the allegations of timekeeping violations to the Virginia State Police.  (Am. Compl. ¶ 53–54.)  Hamden further alleges that all defendants participated in the Virginia State Police investigation and provided incomplete or biased information to this investigation.  (*Id.* ¶ 55.)  Hamden claims that these overt acts took the form of actual participation, failure to intervene, or acquiescence and because of these actions she suffered deprivation of her civil rights, which are outlined in her malicious prosecution claim.  (*Id.* ¶ 94, 98.)  In addition, Hamden alleges that defendants "positively or tacitly came to a mutual understanding to try and accomplish a common and unlawful purpose."  (*Id.* ¶ 95.)  For these reasons, Hamden has adequately pled a claim for conspiracy to violate her civil rights.  The court will deny defendants' motions to dismiss Count IV.

### E.  Intentional and Negligent Infliction of Emotional Distress – Counts V & IV

"In Virginia, a party alleging intentional infliction of emotional distress must prove by clear and convincing evidence that the tortfeasor's conduct was intentional or reckless, that the conduct was outrageous and intolerable, that the conduct caused emotional distress, and that the distress suffered was severe."  *Hazzis v. Modjadidi*, 69 Va. Cir. 385 (2005) (citing *Russo v. White*, 241 Va. 23, 26 (1991)).  "The Supreme Court has stated that even if the conduct was outrageous, 'liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it.'"  *Id.* (quoting *Russo*, 241 Va. at 27).

"In *Russo*, 241 Va. at 25, . . . the Virginia Supreme Court affirmed the dismissal of plaintiff's suit where she alleged severe emotional distress in the form of nervousness, sleeplessness, stress and its physical symptoms, withdrawal from activities, and lack of concentration."  *Michael v. Sentara Health Sys.*, 939 F. Supp. 1220, 1233 (E.D. Va. 1996).  "The

court noted that plaintiff did not claim that she had any objective physical injury caused by the stress, that she sought medical attention, that she was confined at home or in the hospital, or that she lost income." *Id.* "Accordingly, the court found that her allegations were 'not the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it.'" *Id.*

To plead a claim of negligent infliction of emotional distress a plaintiff must allege negligent conduct and "emotional disturbance and physical injury resulting therefrom." *Hughes v. Moore*, 214 Va. 27, 34 (1973). "[T]here may be recovery for negligent conduct, notwithstanding the lack of physical impact, provided the injured party properly pleads and proves by clear and convincing evidence that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence." *Id.* In *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 137 (2000), the appellate court held that the lower court did not err in dismissing plaintiff's claim for negligent infliction of emotional distress because plaintiff failed to specifically plead any physical injury that she suffered as a result of emotional distress.

Here, the emotional distress that Hamden allegedly suffered did not rise to the extreme level necessary to plead intentional or negligent infliction of emotional distress. Hamden claims that she "suffered severe and ongoing loss of reputation and professional standing, loss of employment, past and ongoing financial injury, an increase in worrying, stress, anxiety, depression, reduced self-esteem and self-confidence, severe emotional distress, and other injury." (Am. Compl. at 21.) However, this type of emotional distress, that largely deals with loss of reputation and employment rather than physical injury, is not so severe and extreme that no reasonable person could be expected to endure it. In addition, Hamden states, without specificity, that she suffered "grievous emotional distress and related physical health issues."

However, this bare recital of the physical injury element of a negligent infliction of emotional distress claim, without more, will not survive a motion to dismiss. Hamden does not state in her pleadings what her physical injury is or was or how it stems from defendants' infliction of emotional distress. For these reasons, Hamden has failed to plead all the requisite elements of a claim for intentional infliction of emotional distress and negligent infliction of emotions distress. The court will grant defendants' motion to dismiss Counts V and VI.

### III. CONCLUSION

For the reasons stated above, the court will enter an order granting Denny, Graham, and Brown's motion to dismiss (Dkt. No. 27) and Bucey's motion to dismiss (Dkt. No. 25) as to Counts III, V, and VI, and denying the same as to Counts I, II, and IV.

Entered: March 26, 2021.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge