IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JANIELE VON EVELYN HAMDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:20-cv-00236 |
| | ) | |
| ELLEN DENNY, | ) | |
| ROBERT F. GRAHAM, | ) | |
| MICHAEL BROWN, | ) | |
| and | ) | |
| ERIC BUCEY, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This case is pending before the court on two motions for summary judgment, one by defendants Michael Brown, Robert Graham, and Ellen Denny (Dkt. No. 68) and one by defendant Eric Bucey (Dkt. No. 71). For the reasons stated below, the court will grant defendants' motions for summary judgment.[1]

I. BACKGROUND

**A. Factual Background**

Plaintiff Janiele Von Evelyn Hamden is a former employee of Radford City Public Schools (RCPS) where she was employed as a professional school counselor for McHarg Elementary. (Am. Compl. 2; Dkt. No. 21.) During Hamden's employment with RCPS, defendant Ellen Denny was the curriculum director for RCPS, defendant Robert Graham was the RCPS Superintendent, and defendant Michael Brown was the Principal of McHarg Elementary School. (Am. Compl. at 4.) Hamden also served as a lead teacher and administrative designee

---

[1] There are also three motions in limine (Dkt. Nos. 95, 99, 102) pending. Because the court is granting summary judgment, the motions in limine will be dismissed as moot.

1

for McHarg's Bee Club. (Am. Compl. 2; Dkt. No. 69-2; Brown Dep. 34, Dkt. No. 78-1.) The Bee Club is an afterschool enrichment program funded by a federal grant known as the 21st century grant which is administered through the Virginia Department of Education. (Am. Compl. 3; Graham Dep. 3–4, Dkt. No. 69-3.)

During Hamden's employment with RCPS, defendant Eric Bucey was the executive director of the non-profit organization, Beans & Rice, Inc. (B&R), which he operated to provide support to public school enrichment programs. (Am. Compl. 3.) RCPS and B&R are co-applicants on the 21st century grant that funds the Bee Club and agreed to a Memorandum of Understanding (MOU) to establish a limited partnership for the purpose of administering the Bee Club. (Graham Dep. 3–4, Dkt. No. 69-3; MOU, Dkt. No. 69-4.) Under the MOU, RCPS is responsible for providing facility space, handling building maintenance, purchasing equipment, collecting time sheets, collecting and tracking data related to program evaluation, paying personnel through grant funds, and submitting reports to VDOE in a timely manner, among other responsibilities. (MOU at 2, Dkt. No. 69-4.) Each party lists an appointee on the MOU as a point of contact to coordinate the activities of each organization in carrying out the MOU. The appointee for RCPS is defendant Robert Graham, and the appointee for B&R is Eric Bucey. (*Id.* at 2.) In addition, Pam Whitesell, a Program Director, and Mary Pannier, a Program Specialist, acted as site coordinators for the McHarg Bee Club. (Whitesell Dep. 55, Dkt. No. 78-7; Bucey Dep. 47–48, Dkt. No. 78-9.)

### 1. *Timesheets for the Bee Club*

According to Hamden, directives concerning timekeeping for the Bee Club were inconsistent and unwritten. (Dkt. No. 77 at 5.) Teachers often billed one hour of planning, preparation, clean-up, or follow-up time, in addition to program time. (Dkt. Nos. 80-2, 80-3, 80-

2

4.) In the fall of 2017, Pannier and Whitesell expressed concern to Bucey that teachers were billing Bee Club time after 5:15 pm, when the program ended. (Bucey Dep. 2, 5–6; Dkt. No. 69-5; Whitesell Dep. 29–30, Dkt. No. 78-7.) Whitesell believed that teachers were only permitted to bill 30 minutes of planning time per day, and she was concerned teachers were billing additional time. (Whitesell Dep. 29–30, Dkt. No. 78-7.) Bucey spoke with the staff at McHarg about these timekeeping concerns, and the staff expressed confusion around timekeeping policies and sought clarity. (Bucey Dep. 5–6; Dkt. No. 69-5.) According to Bucey, he took multiple steps to clarify the timekeeping policy for Bee Club staff. (*Id.*)

On December 5, 2017, Pannier emailed the Bee Club staff to "touch base about a few problems [she had] been seeing with the timesheets." (Whitesell Dep. 53, Dkt. No. 78-7.) Pannier informed the Bee Club staff that they could bill 30 minutes of planning time per day, but they should record that time on a separate line on their timesheet. (*Id.* at 54.) Pannier also directed staff to round their time to the nearest quarter hour. (*Id.*)

On December 6, 2017, Whitesell emailed Hamden, noting that she had heard Hamden had questions about the timesheet requirements. (Whitesell Emails 1, Dkt. No. 69-11.) Hamden explained that she and other staff "have been doing [] time sheets exactly the same for the past 3 years with no issue." (*Id.*) Whitesell replied, "[i]f you have been doing timesheets that way for three years, someone should have corrected it." (*Id.*) Given the continued confusion, Whitesell held a meeting with Bee Club staff in December 2017 and "talked about timesheets and Planning Time," as well as the need to submit activity plans to support planning time. (Whitesell Dep. 30, Dkt. No. 78-7.)

In January 2018, at Bucey's direction, Whitesell developed timekeeping guidelines and sent them the Bee Club staff. (*Id.* at 32–33.) The guidelines indicate that teachers may bill 30

minutes of planning time for every day they work, but they must do the planning onsite unless otherwise approved. (Guidelines, Dkt. No. 69-8.) In addition, the guidelines define program time as "actual program time and any time necessary for clean-up." (*Id.*) According to a Bee Club teacher, some teachers interpreted these guidelines as allowing for 30 minutes of clean-up time per day separate from the 30 minutes of planning time. (Goodman Dep. 85, Dkt. No. 78-3.)

In March 2018, Hamden and another teacher asked Pannier to review their timesheets and confirm that they had complied with the new guidelines. (Whitesell Dep. 36, Dkt. No. 78-7; Pannier Dep. 87–89; Dkt. No. 78-6.) Pannier told Hamden that her timesheet looked good and "mostly matched what [Whitesell] discussed in her meeting." (Whitesell Dep. 36, Dkt. No. 78-7.) Nevertheless, Pannier recalls ongoing compliance issues, which she discussed with Bucey and Whitesell. (Pannier Dep. 82, Dkt. No. 78-6.) According to Pannier, she expressed frustration to Bucey because "[she] felt like [she] was talking in circles and not being understood" by Hamden. (Pannier Dep. 82, Dkt. No. 78-6.)

On May 1, 2018, Pannier emailed the Bee Club staff and told them that they would need to switch to a time clock time-keeping system called Veritime. (Veritime Email, Dkt. No. 81-5.) The email indicated that the change was part of an effort to "align [the] timekeeping procedures" for all "RCPS hourly positions." (*Id.*) Use of the Veritime system eliminated the need to complete paper timesheets. (*Id.*) In the Veritime email, Pannier also reminded Bee Club staff of the grant policy that "[e]ach staff member only gets 30 minutes of paid planning time per work day" and "planning time must have documentation that shows what [staff] are doing during that time." (*Id.*) In response, Hamden sent an email to Pannier and Brown, copying Bucey, Whitesell, and others, in which she stated that the Bee Club teachers collectively decided that "[i]f [the teachers we]re going to finish out May . . . [they] will not be clocking in and out."

(Veritime Response, Dkt. 69-1.) Hamden proposed that Pannier allow the Bee Club teachers to continue using their paper timesheets or, alternatively, hire replacement staff. (*Id.*)

According to Bucey, Hamden's email regarding the Veritime system "just didn't pass the sniff test." (Bucey Dep. 13, Dkt. No. 69-5.) From Bucey's perspective, "[Hamden] came off as somebody who was protecting something or had something that [] they were not wanting to disclose." (*Id.*) Bucey has this perception, in part, because "[t]he Veritime system ha[d] been implemented at other schools, and no one else had objected in th[e] same manner." (*Id.*) Hamden's objections to the Veritime system prompted Bucey to review Hamden's April timesheet, and Bucey noticed that Hamden routinely billed hours until 6:15 pm, an hour after the program ended every day. (*Id.* at 9; April Timesheets, Dkt. No. 69-13.) Bucey notified Graham about the issue with Hamden's April timesheet. (Graham Dep. 7–8, Dkt. No. 69-3.) Graham shared this information with Brown and asked Brown to review the video footage from the school security system to determine whether Hamden had worked past 5:15 pm as represented on her timesheet. (Brown Dep. 4–5, Dkt. No. 69-9.) Brown reported to Graham that it appeared Hamden had not worked her full time based on the times she entered and exited the building in the video footage. (*Id.* at 5.)

  2. *Hamden's Suspension from Bee Club and RCPS*

On May 2nd or 3rd, 2018, Graham met with Hamden and another teacher for a "coaching meeting" to discuss the change to the Veritime system. (Graham Dep. 101–102; Dkt. No. 78-8.) Graham explained the rules and guidelines associated with timekeeping for the Bee Club, but also noted that Hamden was valuable to the program and he wanted her to continue working for the Bee Club. (*Id.* at 103–104.)

Later, on May 3, 2018, Denny and Brown met with Hamden and suspended her from the Bee Club for timesheet discrepancies.  (Brown Dep. 9–10; Dkt. No. 69-9.)  Afterwards, Hamden sent an email to Brown, Denny, and Graham stating that she resigned from the Bee Club.  (Bee Club Resignation Letter, Dkt. No. 81-16.)  Hamden wrote, "[t]he reason for this [resignation] is due not only to the events that have transpired today, but also the extreme challenges that remain unresolved and have for my three years in this program."  (*Id.*)

On May 4, 2018, Hamden received a letter from Brown indicating that he recommended to Graham that Hamden be suspended from RCPS while the school investigated her timekeeping.  (RCPS Suspension Recommendation, Dkt. No. 69-16.)  On May 7, 2018, Graham informed Hamden that he approved Brown's recommendation, and she was suspended with pay.  (RCPS Suspension Letter, Dkt. No. 69-17.)

*3. RCPS Internal Investigation and Hamden's Resignation*

RCPS then began an internal investigation into Hamden's timekeeping practices. Graham asked Brown to review Hamden's timesheets again and compare them with the timesheets of several other employees.  (Graham Dep. 131; Dkt. No. 78-8.)  In addition, Graham asked Brown to review additional video footage from the school security cameras and compare the times that Hamden left the school in the video to the time she reported working on her timesheet.  (*Id.*)  Graham reasoned that, as he understood the Bee Club guidelines, teachers were supposed to complete their planning time on-site.  (*Id.* at 132.)

On May 10, 2018, Hamden and her attorney, Cliff Harrison, met with Brown and Denny. (Brown Dep. 15–16, Dkt. No. 69-6.)  According to Brown, Harrison said that "if there were days that [Hamden] didn't work, [she] would be happy to cut a check [to the school for that time.]" (*Id.* at 16.)

6

On May 14, 2018, Hamden submitted a letter of resignation to Graham. (RCPS Resignation Letter, Dkt. No. 69-19.) Hamden explained that she was resigning from her position as an RCPS school counselor. (*Id.*) She explained that she had "always done as instructed" with regards to her timesheet. (*Id.*) She questioned why, "if [her] timesheets were in fact in error, [] supervisors continued to sign and approve them for years." (*Id.*) She also noted that many of her peers shared her "timesheet discrepancies" but they were not under investigation by RCPS for the same conduct. (*Id.*) Further, Hamden admitted that there were four days she billed for and had not worked. (*Id.*) She wrote, "I am fully accountable for those errors and have offered to reimburse them, to which I was never given a reply." (*Id.*) Later that day, Harrison emailed Denny requesting an invoice so that Hamden could pay the school for any money she owed on her incorrect timesheets. (Harrison Email; Dkt. No. 69-20.)

*4. Virginia State Police Investigation and Subsequent Prosecution*

When Graham "had enough evidence to really worry that there were a lot of [timesheet] inaccuracies" he contacted the local police. (Graham Dep. 19–21, Dkt. No 69-3.) The local police recommended that Graham contact the state police. (*Id.*) Graham discussed the matter with Bucey, and, sometime around May 15, 2018, Bucey called the state police to report the issues with Hamden's timesheets. (Bucey Dep. 18, Dkt. No. 69-5.) After Bucey's report, Special Agent McGuire of the Virginia State Police began an investigation into the matter. (McGuire Dep. 5, 8–9, 11; Dkt. No. 69-21.) Special Agent McGuire gathered documents and conducted numerous interviews, including with defendants. (*Id.* at 6–7.) At the conclusion of the investigation, McGuire turned the case over to the Commonwealth's Attorney, Christian Rehak, without an explicit recommendation to prosecute. (*Id.* at 7.)

7

Rehak decided to prosecute Hamden, presented the case to a grand jury, and the grand jury returned true bills for 17 felony charges, most of them for obtaining money by false pretenses. (*Id.* at 7; Rehak Dep. 2–5, 20, Dkt. No. 9.) However, on June 11, 2019, after Rehak sent a letter to Hamden's attorney stating that, "[a]fter due consideration, several meetings and additional facts not disclosed during the original investigation, [he] fel[t] the right things [to do] is to *nole prosse* all charges . . . ." (Rehak Letter 2, Dkt. No. 72-34.) Nevertheless, Rehak explained that "the Commonwealth does believe that the sick days, personal leave, snow days and video evidence pertaining to the month of March 2018, justify partial restitution from Ms. Hamden." (*Id.*) "A conservative estimate of paid time submitted in "clear error" is 25 hours or $625 dollars." (*Id.*) Hamden made the restitution payments, and on June 18, 2019, the Radford City Circuit Court entered an order of *nolle prosequi*. (Dkt. Nos. 79-35, 79-36.) Rehak states that he would have *nolle prossed* the charges even without the restitution payment because he no longer thought he could prove Hamden's guilt beyond a reasonable doubt. (*Id.* at 13.)

**B. Procedural Background**

On April 23, 2020, Hamden filed suit against Brown, Bucey, Denny, and Graham alleging: (1) a state claim of malicious prosecution; (2) a federal claim for malicious prosecution; (3) a 42 U.S.C. § 1983 civil rights claim for deprivation of a liberty interest without due process; (4) conspiracy to violate civil rights; (5) intentional infliction of emotional distress; and (6) negligent infliction of emotional distress. (Compl., Dkt. No. 1.) Defendants later filed motions to dismiss, and the court dismissed all counts except for the state and federal malicious prosecution claims and the conspiracy claim. (Dkt. Nos. 56, 57.)

On May 26, 2021, defendants Denny, Graham, and Brown filed a motion for summary judgment arguing that the evidence does not support a malicious prosecution or conspiracy

claim, and, even if it did, defendants are entitled to qualified immunity. (Dkt. Nos. 68, 69.) Defendant Bucey filed a separate motion for summary judgment with similar arguments and further alleging that Bucey is not a state actor. (Dkt. Nos. 71, 72.)

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate where an examination of the pleadings, affidavits, and other discovery materials before the court indicates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Pence v. Tenneco Auto. Operating Co.*, No. 5:04CV00075, 2005 WL 999972, at *2 n.2 (W.D. Va. Apr. 26, 2005), *aff'd*, 169 F. App'x 808 (4th Cir. 2006) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "The burden is on the movant to establish that no material factual disputes exist." *Id.* "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### B. Malicious Prosecution

Hamden has brought both federal and state malicious prosecution claims against defendants. A federal "malicious prosecution claim under [42 U.S.C.] § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). "To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.* (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)). The elements of a

9

Virginia common law claim for malicious prosecution are the same as the federal claim, but the state claim also requires malice. *Cadmus v. Williamson*, No. 5:15-CV-00045, 2016 WL 929279, at *10 (W.D. Va. Feb. 1, 2016). For the reasons stated below, Hamden's federal claim for malicious prosecution fails, and, therefore, her state law claim also fails.

   *1. Causation*

The constitutional tort of malicious prosecution "require[s] a demonstration of both but-for and proximate causation." *Evans*, 703 F.3d at 647 (citing *Murray v. Earle*, 405 F.3d 278, 289–90 (5th Cir. 2005); *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999)). "[S]ubsequent acts of independent decision-makers (e.g., prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant[]'s misconduct and a plaintiff's unlawful seizure." *Id.* (citing *Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000)). "Such 'intervening acts of other participants in the criminal justice system' insulate a [defendant] from liability." *Id.* (quoting *Zahrey*, 221 F.3d at 351) (collecting cases). Nevertheless, an individual "may be liable when they have lied to or misled the prosecutor, failed to disclose exculpatory evidence to the prosecutor; or unduly pressured the prosecutor to seek the indictment." *Evans*, 703 F.3d 636, 647–48 (4th Cir. 2012) (citing *Sykes v. Anderson*, 625 F.3d 294, 317 (6th Cir. 2010); *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008); *Sanders v. English*, 950 F.2d 1152, 1159–60 (5th Cir. 1992); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988)).

Under Virginia law, "a person institutes criminal proceedings against another by: (1) bringing the criminal charge; or (2) cooperating actively in bringing the criminal charge." *Bennett v. R & L Carriers Shared Servs.*, LLC, 744 F. Supp. 2d 494, 510 (E.D. Va. 2010), *aff'd*, 492 F. App'x 315 (4th Cir. 2012). Virginia courts look to "whether a defendant affirmatively,

actively, and voluntarily took steps to instigate or to participate in the arrest of the defendant, and whether the defendant exercised some level of control over the decision to have the plaintiff arrested." *Id.* at 512. Courts also consider whether defendants "ever urged or even suggested to the Commonwealth's attorney that he prosecute the plaintiff." *Id.* at 511 (citing *Am. Ry. Express Co. v. Stephens*, 148 Va. 1, 138 S.E. 496, 500 (1927)). Generally, "if a defendant simply reported the occurrence of events to the police, gave information to the police, and responded to police requests to verify a suspect's identity, then that individual cannot be held liable for malicious prosecution so long as the information provided was with an honest or good faith belief of the facts reported." *Id.* at 512.

Here, the defendants had various levels of involvement in the investigation of Hamden, but none of defendants' involvement amount to the but-for causation of her prosecution or active cooperation in bringing charges against Hamden. Although Graham reported Hamden to the local police and Bucey reported Hamden to the state police, these actions did not cause the state to bring charges against Hamden. Rather, Special Agent McGuire conducted an independent investigation into the matter. After reviewing McGuire's investigation, the Commonwealth's Attorney made the decision to prosecute Hamden. Finally, the Commonwealth's Attorney presented the case to a grand jury, which returned true bills for felony charges against Hamden. Even though defendants were involved in the internal investigation of Hamden, and Graham and Bucey reported Hamden to the police, the intervening acts including the investigation by Special Agent McGuire, the decision to prosecute by the Commonwealth's Attorney, and the true bills of felony charges returned by the grand jury break any causal chain between defendants' actions and Hamden's prosecution.

Hamden argues that even if defendants did not initiate the prosecution, "defendants collectively worked to wall off any investigation that could have revealed institutional problems with recording time in compliance with the grant by isolating Hamden as a scapegoat 'rogue' employee 'cheating' the program." (Dkt. No. 77 at 25.) Hamden alleges, that "[w]hen Bucey was interviewed, he provided false information and failed to disclose exculpatory information" to investigators. (*Id.* at 26.) Hamden also claims that, in interviews with McGuire, Graham "made false comparisons between Hamden and other lead teachers to drive the conclusion that Hamden was billing against policy." (*Id.*) Finally, Hamden claims that Brown and Denny "each provided false information to McGuire in their interviews." (*Id.*)

Despite Hamden's allegations, there is no evidence before the court that defendants lied to McGuire or the Commonwealth's Attorney. Further, there is no evidence that defendants encouraged the Commonwealth's Attorney to pursue charges against Hamden. Instead, McGuire testified that defendants were fully cooperative with her investigation and never encouraged McGuire to pursue indictments against Hamden. (McGuire Dep. 13.) In fact, Graham specifically requested that McGuire not pursue any type of criminal prosecution against Hamden. (Graham Dep. 30, Dkt. No. 69-3.) For these reasons, the evidence is such that a jury could not reasonably conclude that defendants caused Hamden's prosecution.

   *2. Probable Cause*

"[I]n the context of a malicious prosecution action, probable cause is defined as knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *R.M.B. v. Bedford Cnty. Sch. Bd.*, 169 F. Supp. 3d 647, 653 (W.D. Va. 2016) (quoting *O'Connor v. Tice*, 281 Va. 1, 9 (2011)). "The determination of whether a defendant had probable cause to

believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charge." *Bennett v. R&L Carriers Shared Servs.*, 744 F. Supp. 2d 494, 514 (E.D. Va. 2010). ""[B]y law, an indictment, fair upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause." *Smith v. Munday*, 848 F.3d 248, 255 (4th Cir. 2017).

In this case, Hamden was charged after the Commonwealth's Attorney presented her case to a grand jury, and the grand jury retuned true bills for 17 felony charges, most of them for obtaining money by false pretenses. These bills issued by the grand jury are sufficient to establish probable cause. Hamden argues that because "[t]he presence of probable cause is judged at the time the defendant took the action initiating the criminal charges, in this case, [the court must look to when defendants] turn[ed] the 'investigation' over to the VSP and participat[ed] in the VSP investigation." (Dkt. No. 77 at 26.) However, as discussed in the section above, defendants did not "initiate criminal charges" by reporting Hamden's timecard discrepancies to the police or by cooperating with Special Agent McGuire in her investigation of the matter. Rather, the state brought charges against Hamden after the return of true bills of felony charges by a grand jury, which satisfies the requirement for probable cause.

### 3. Termination of Criminal Proceedings

To state a federal claim for malicious prosecution the "prior criminal case against the plaintiff [must] ha[ve] been disposed of in a way that indicates the plaintiff's innocence." *Snider v. Seung Lee*, 584 F.3d 193, 202 (4th Cir. 2009) (citing *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997)). Under Virginia law, the prior prosecution against the plaintiff must simply have been "terminated in a manner not unfavorable to the plaintiff." *Davis v. Bacigalupi*, 711 F. Supp. 2d 609, 625 (E.D. Va. 2010) (quoting *Hudson v. Lanier*, 255 Va. 330, 497 S.E.2d 471, 473

13

(1998)). Generally, a *nolle prosse* order is sufficient evidence that the prosecution has been terminated in the defendant's favor. *Bennett v. R & L Carriers Shared Servs.*, LLC, 492 F. App'x 315, 333 (4th Cir. 2012) (citing *Graves v. Scott*, 104 Va. 372, 51 S.E. 821, 823 (1905)). However, "Virginia has recognized only one exception to the rule that an order of *nolle prosequi* permits a malicious prosecution claim to go forward, namely cases where the order was entered as a result of an agreement between the government and defendant." *Bennett*, 492 F. App'x at 333 (4th Cir. 2012) (citing *Orndorff v. Bond*, 185 Va. 497, 39 S.E.2d 352 (1946); *Snyder v. City of Alexandria*, 870 F. Supp. 672 (E.D. Va. 1994)).

Defendants argue that Hamden cannot show that the prosecution terminated in her favor because she paid restitution. Hamden argues that the prosecution did terminate in her favor because Rehak would have *nolle prossed* the case even without her restitution payments. Hamden is correct. Rehak testified that even if Hamden had objected to paying restitution, "[he] would have still nolle prosequid all of these charges . . . [because he] d[i]dn't feel [he] could have won th[e] case trying it . . . ." (Rehak Dep. 20, Dkt. No. 69-1.) Even though the prosecution terminated in Hamden's favor, she is unable to establish the other elements of malicious prosecution. Therefore, the court will grant summary judgment for defendants on the malicious prosecution claims.

## C. Conspiracy

To establish a conspiracy claim under § 1983, a plaintiff "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Massey v. Ojaniit*, 759 F.3d 343, 357–58 (4th Cir. 2014) (citing *Hinkle v. City of Clarksburg, W. Va.,* 81 F.3d 416, 421 (4th Cir. 1996)). "An essential element in any claim of conspiracy to deprive the plaintiff of his

14

constitutional rights is an agreement to do so among the alleged co-conspirators." *Shelton v. Angelone*, 148 F. Supp. 2d 670, 679 (W.D. Va. 2001) (*citing Ballinger v. North Carolina Agricultural Extension Service*, 815 F.2d 1001 (4th Cir. 1987)). "In other words, plaintiffs must at least be able to show a deprivation of a constitutional right as a result of the alleged conspiracy." *Shooting Point, L.L.C. v. Cumming*, 243 F. Supp. 2d 536, 537 (E.D. Va. 2003). "This is because '[t]he gist of the cause of action is the deprivation and not the conspiracy.'" *Id.* (quoting *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538, 540 n. 2 (7th Cir. 1975)); *see also Walker v. Johnson*, 446 F. Supp. 3d 88, 103 (W.D. Va. 2020) (the conspiracy claim fails where the officers are immune from liability on the underlying constitutional violation). Here, since the plaintiff cannot prove malicious prosecution, she cannot prove that there is an underlying constitutional violation to support her conspiracy claim. As such, the conspiracy claim also fails.

### III. CONCLUSION

For the reasons stated above, the court will grant summary judgment in favor of the defendants.

Entered: March 18, 2022.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge